PEOPLE v SALAZAR

Docket No. 76340. Submitted November 7, 1984, at Grand Rapids.— Decided January 3, 1985. Leave to appeal applied for.

Domingo Salazar was convicted of two counts of inciting, inducing, or exhorting another to commit murder following a bench trial in Barry Circuit Court and was sentenced, Richard M. Shuster, J. Defendant appealed. *Held:*

1. The statute which prohibits inciting, inducing or exhorting commission of an offense is not limited to street riot situations.

2. The crime of incitement does not require that an overt act be committed.

3. The fact that the person defendant incited was a police agent and that the police agent would not really commit the murder does not prevent defendant's conviction under the incitement statute.

4. Defendant's argument that inciting one to aid and abet a murder is not a crime is rejected.

5. The evidence does not support a finding of imminence. An element of imminence is crucial to a finding of incitement. Furthermore, there is an insufficiency of proof of incitement. The testimony may have supported a conviction for conspiracy to kill but does not support a conviction for incitement to aid and abet murder under the incitement statute.

Reversed and conviction ordered vacated.

1. HOMICIDE — INCITEMENT TO MURDER — SCOPE OF STATUTE.

The scope of the statute proscribing the inducement, incitement, or exhortation of another person to commit felonies or circuit

REFERENCES FOR POINTS IN HEADNOTES

[1] 54 Am Jur 2d, Mobs and Riots §§ 1, 4.

[1-5] 21 Am Jur 2d, Criminal Law §§ 162, 164.

40 Am Jur 2d, Homicide §§ 25, 28, 29, 564 *et seq.*

Criminal responsibility under 18 USCS § 2(b) of one who lacks capacity to commit an offense but who causes another to do so. 52 ALR Fed 769.

Construction and effect of statutes making solicitation to commit crime a substantive offense. 51 ALR2d 953.

[2, 3] 21 Am Jur 2d, Criminal Law §§ 4, 130.

[3-5] 21 Am Jur 2d, Criminal §§ 168-172.

court misdemeanors is not limited to street riot situtations (MCL 750.157b; MSA 28.354[2]).

2. HOMICIDE — INCITEMENT TO MURDER — OVERT ACTS.

Proof of an overt act on the part of a defendant is not necessary for a conviction under the statute which proscribes the inducement, incitement, or exhortation of another person to commit felonies or circuit court misdemeanors (MCL 750.157b; MSA 28.354[2]).

3. HOMICIDE — INCITEMENT TO MURDER.

Conviction of the statutory crime of incitement, inducement, or exhortation of another to commit a felony or circuit court misdemeanor which would endanger the life of another requires proof only that the defendant, in fact, incited, induced, or exhorted the other person to undertake the act; accordingly, the crime is complete where the defendant seeks to induce, incite, or exhort the commission of the specified offenses even though the person the defendant seeks to incite, induce, or exhort is a police informant who would not be induced to commit any of the specified offenses (MCL 750.157b; MSA 28.354[2]).

4. HOMICIDE — INCITEMENT TO MURDER — AIDING AND ABETTING.

Inciting another person to aid and abet a murder is a crime under the statute which proscribes the inducement, incitement, or exhortation of another person to commit felonies or circuit court misdemeanors (MCL 750.157b; MSA 28.354[2]).

5. HOMICIDE — INCITEMENT TO MURDER — IMMINENT ACTION.

There must be an element of imminence to the act which is being incited before there can be a conviction under the statute which proscribes the inducement, incitement, or exhortation of another person to commit a felony or circuit court misdemeanor (MCL 750.157b; MSA 28.354[2]).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Judy A. H. Hughes,* Prosecuting Attorney, and *Leonard J. Malinowski,* Assistant Attorney General, for the people.

State Appellate Defender (by *Gail Rodwan),* for defendant on appeal.

Before: R. B. BURNS, P.J., and ALLEN and T. L. BROWN,* JJ.

PER CURIAM. Following a bench trial on October 26, 1983, defendant was found guilty of two counts of inciting, inducing, or exhorting another to commit murder, MCL 750.157b; MSA 28.354(2). Sentenced to two mandatory terms of life imprisonment, defendant appeals as of right raising six grounds of error, one of which we find controlling. We reverse.

At the preliminary examination the examining magistrate found probable cause to believe that defendant proposed to have Isidro Martinez, Jr., and undercover police informant, kill State Police Detectives Ronald Neil and Larry Kimmel. The circuit judge affirmed the finding of probable cause but *sua sponte* remanded the case to district court so that the district court could consider the defense of abandonment. The prosecution appealed by leave granted and in *People v Salazar,* 124 Mich App 249; 333 NW2d 567 (1983), our Court ruled that the circuit court was without authority to remand after finding probable cause. We reversed and ordered trial by the circuit court.

In June, 1981, defendant had been convicted of conspiracy to defraud an insurance company. Testifying against him at the trial were State Police Detectives Ronald Neil and Larry Kimmel. In late August, 1981, rumors began to circulate that defendant, who was then confined in the Barry County jail, wanted to kill or have someone kill Neil and Kimmel. Local authorities determined to investigate the rumor and for this purpose arranged to have Isidro Martinez, Jr., a paid police informer, incarcerated in the Barry County jail on the guise that he had been "convicted" of posses-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

sion of cocaine and sentenced to three years' probation, the first three months to be served in the Barry County jail in the work-release section.

Martinez entered the jail September 9, 1981, and soon was on a conversational basis with defendant. Defendant told Martinez that he had an appeal pending and said that he was going to talk to Kimmel to see if Kimmel would tell the truth at the "appeal trial". Martinez told defendant that he had a brother-in-law who, for $40 or $50, would break a person's arm to prompt him to tell the truth; defendant replied by refusing the offer and indicating that when he "[took] care of them" he would "take care of them for good", or words to that effect. Martinez replied by saying that his brother-in-law and other acquaintances could also take care of them, to which defendant replied that he would "see what happens". Martinez also testified that in a later conversation with defendant, defendant told Martinez that he had been in Viet Nam in the Army Special Forces (Green Berets) and that he had experience in building demolition bombs. Defendant purportedly also said that a car bomb was the way he wanted Neil and Kimmel to disappear. As the conversation about the bombs proceeded, defendant indicated that he had everything to make a bomb except a plastic explosive known as C-4, to which Martinez replied by saying that he had a friend in Chicago who might be able to obtain some C-4 for him.

In another conversation sometime later, Martinez informed defendant that his friend had the C-4, almost four pounds of it, and that his friend wanted a "fair" price for it. Defendant then allegedly told Martinez that payment for the explosives would be arranged through a "young attorney friend" of defendant. Martinez then set up a meeting to arrange for transportation of the C-4 from

Chicago to Barry County. However, defendant indicated to Martinez that he did not want to meet with anybody and did not show up for the meeting.

Martinez also testified that at one point he asked defendant if he, Martinez, could get the contract to kill Neil or Kimmel, to which defendant replied in the affirmative. Defendant kept putting Martinez off as to specifics as defendant did not wish to talk inside the jail.

Defendant testified on his own behalf and stated that, during the time Martinez was in jail, he spent a lot of the time bothering defendant and kept asking defendant about his case. Finally, according to defendant, he told Martinez about his case and then Martinez kept telling defendant that he should kill Neil and Kimmel and that he had a friend who would break their legs or inflict some similar injury. Defendant testified that he became suspicious of Martinez because of things that were said, things that Martinez apparently knew, and the fact that Martinez said that he was from a village in Mexico called Tekalotai, which a co-worker of defendant explained to him was a slang Spanish word meaning a "policeman who worked at night". Further, he testified that Martinez had told him that he worked at Woodbury Elevator, but that he checked with Woodbury and Martinez did not work there.

Defendant also testified that he also made a transcript of the recordings obtained by Martinez while in jail and that he believed that they were recorded out of order. Apparently, the theory is that Martinez would put a question on the tape, shut the recorder off, and at some point later ask defendant a different question and turn the tape back on so as to get a different answer to the question on the tape.

Because MCL 750.157b; MSA 28.354(2)—the stat-

ute under which defendant was convicted—is relatively new and the decisions thereunder sparse, it will be helpful to discuss the background and nature of the offense charged. Because this statute was enacted in the wake of Detroit's 1967 riots, it is not surprising that persons charged thereunder claim that the statute is limited to street riot situations.[1] This argument was discussed at some length by Justice LEVIN in *People v Shafou,* 416 Mich 113, 133-141; 330 NW2d 647 (1982). In that opinion, the Supreme Court was unable to reach a consensus on whether the statute was intended to include nonriot behavior. However, in *People v Plyler,* 104 Mich App 437, 445; 304 NW2d 859 (1981), this Court rejected the claim that § 157b was concerned only with riot-type situations:

"Perhaps it might better be said that the unlawful happenings of the time alerted the Legislature to enact legislation to fill a void in the existing laws in order to punish persons who incite, induce, or exhort other persons to commit prohibited offenses, whether or not during civil disorders."

We agree with *Plyler.* Had the Legislature intended to limit § 157b to riot-like behavior, we believe the Legislature would have explicitly said so, and the fact that the statute was not so limited leads us to conclude that the Legislature intended the statute to extend to situations similar to the case before us.

Defendant also argues that § 157b is not violated unless there is proof of an overt act and actual incitement. With respect to an overt act requirement, the Court in *Shafou, supra,* considered that issue, but a majority of justices were unable to agree on whether or not such a requirement ex-

---

[1] Section 157b was added by PA 1968 308, effective July 1, 1968.

ists. This Court was also faced with the issue in *Plyler, supra,* pp 445-446, but did not decide if an overt act was required as it found that, in any event, there had been an overt act in that case. Defendant argues that since Michigan does not require an overt act for conspiracy, to require an overt act for the crime of incitement would be the basis for distinguishing between incitement and conspiracy. However, this analysis is not correct. If there is no overt act requirement for incitement, the crime of incitement would still be distinguishable from conspiracy since conspiracy requires an agreement and incitement does not. Since Michigan does not require an overt act for a conviction for conspiracy and since defendant does not produce any authority for the proposition that an overt act is required for incitement, we conclude that there is no overt act requirement for incitement. See *People v Scotts,* 80 Mich App 1, 14; 263 NW2d 272 (1977) (no overt act requirement for conspiracy).

Defendant next argues that there must be actual incitement but because Martinez was a police agent and in that capacity could not be incited, in fact, defendant was not guilty of the crime charged. This issue was addressed by this Court in *People v Dennis,* 128 Mich App 235; 340 NW2d 81 (1983). In *Dennis,* the defendant approached an undercover detective who was posing as a professional "hit man" to arrange for the killing of certain people. This Court found it to be irrelevant that the detective could not actually be incited or induced to commit the crime. *Dennis,* p 238. We agree and hold there is no requirement of actual incitement.

Defendant also argues that while there may be a crime of inciting another person to murder, there is no such crime as inciting another *to aid and*

*abet* a murder. Defendant's argument is two-fold: First, that such a crime is unknown in Michigan and, second, that before a person can be an aider and abettor, there must be a crime, and since there was no murder in this case, there was no aider and abettor. *People v Burgess,* 67 Mich App 214, 220; 240 NW2d 485 (1976). The issue raised is of first impression.

Section 157b provides as follows:

> "Any person *who incites, induces or exhorts any other person* to unlawfully burn any property, to murder, *to kill,* to wound or *to commit an aggravated or felonious assault on any person or to do any act which would constitute a felony* or circuit court misdemeanor, that may endanger or be likely to endanger the life of any person, or *who aids and abets in any such inciting, inducing or exhorting* shall be punished in the same manner as if he had committed the offense, incited, induced or exhorted." (Emphasis added.)

Aiding and abetting a murder is a felony, MCL 767.39; MSA 28.979. Under the explicit language of the statute, any person who incites a third person "to do any act which would constitute a felony" is to be punished in the same manner as if he committed the offense. Also, aiding and abetting a murder is an act "likely to endanger the life of any person". Clearly, § 157b makes inciting another to aid and abet a murder a crime. Accordingly, we reject defendant's claim that inciting one to aid and abet a murder is not a crime.

So far in our discussion of the background and nature of § 157b we have touched on the issues where we disagree with defendant. We now turn to issues where we agree. The first is the element of imminence. Crucial is the legal principle that there must be an element of imminence to the act which is being incited. This principle was consid-

ered in *People v Chapman,* 80 Mich App 583; 264 NW2d 69 (1978), where defendant was charged and found guilty under § 157b. On appeal, the defendant argued that § 157b was unconstitutionally vague, citing *Brandenburg v Ohio,* 395 US 444; 89 S Ct 1827; 23 L Ed 2d 430 (1969). This Court agreed that an inciting statute must have an element of imminence, but construed § 157b as having that element. *Chapman, supra,* p 588:

"The terms used in the statute clearly indicate that it is intended to prohibit only the sort of call to action which the Supreme Court in *Brandenburg* distinguished from mere advocacy. The words 'incite, induce or exhort' themselves imply imminence of action. The natural and expected result of incitement, inducement or exhortation is action by the person incited, induced or exhorted. Merely teaching or advocating the necessity of lawlessness, without urging immediate acts of lawlessness, would not fall within the terms of the statute and could not be punished thereunder. It is only conduct such as defendant's—urging the immediate commission of a dangerous felony or misdemeanor—which constitutes inciting, inducing or exhorting and is provided by MCL 750.157b; MSA 28.354(2)."

However, the *Chapman* Court determined that defendant's incitement was sufficiently immediate and affirmed the conviction. *Chapman,* pp 588-589.

This Court again considered the imminence requirement under § 157b in the recent case of *People v Owens,* 131 Mich App 76; 345 NW2d 904 (1983). In *Owens,* the defendant met with Detective John Fiedler, who was posing as a "hit man"[2] who was to receive $1,000 each for killing two of the defendant's former business partners. However, the money was never paid. At trial, the

[2] Detective Fiedler was also involved in the instant case, met with informant Martinez at the Barry County jail the day before meeting with the defendant in *Owens,* and testified at the Salazar trial.

defendant was convicted on two counts of incitement of first-degree murder under § 157b. On appeal, the defendant claimed, *inter alia,* as does defendant here, insufficient evidence of imminence in the incitement. In a two-to-one decision our Court agreed, holding that the prosecution did not produce sufficient evidence that defendant urged imminent action:

"The prosecution did not present sufficient evidence that the defendant urged imminent action to justify a trier of fact in reasonably concluding that defendant was guilty beyond a reasonable doubt of incitement of first-degree murder. *People v Hampton,* 407 Mich 354, 368; 285 NW2d 284 (1979), *cert den* 449 US 885; 101 S Ct 239; 66 L Ed 2d 110 (1980). The defendant did not urge Fiedler to commit the murders immediately. In fact, he agreed that Fiedler would not perform the killings until Fiedler was paid one-half of his fee, and defendant never paid Fiedler that money. In addition, defendant gave Fiedler neither the schedules nor photographs of the intended victims." *Owens, supra,* p 86.

In the instant case, the evidence simply does not support a conclusion that there would be any immediate action to kill either Neil or Kimmel. After having perused the record, we find no testimony to indicate that anything had gone even beyond the preparatory stages, *e.g.,* obtaining explosives, or that defendant intended to immediately proceed to kill either Neil or Kimmel. In fact, Martinez testified that defendant indicated he wanted Neil and Kimmel murdered sometime after he was released from jail, which would be on December 24, 1981, and before his civil suit came to trial in January of 1983. Further, even when considering that the precise charge was inciting someone to aid and abet, the evidence does not support a conclusion that there was any imminence in defendant's wanting Martinez to aid and

abet the murder. Defendant had not kept a meeting that Martinez had set up with his "brother-in-law". When Martinez offered to take care of the killing himself, defendant replied with a "we'll see". In short, whenever Martinez wanted defendant to get more specific on the arrangements to kill Neil and Kimmel, defendant kept putting Martinez off.

In addition to the lack of evidence on the element of imminence, we find an insufficiency of proof of incitement. In *Chapman, supra,* this Court considered the meaning of the statutory words "incite, induce or exhort" and found them to mean urging to action, persuading, or urging earnestly.[3] The record reflects that it was Martinez who did the inciting, inducing, and exhorting, and in the main the defendant was only responding to Martinez's solicitations. It was Martinez who attempted to arrange a meeting between defendant and Martinez's brother-in-law, a meeting which defendant neither wanted to attend nor did attend. When defendant failed to show up for the meeting, it was Martinez who told defendant he would obtain the C-4 explosive anyway, and only after defendant was told that did defendant ask Martinez to bring him a sample. Time and again on cross-examination, Martinez admitted that it was he who solicited the defendant to participate in the crime and not the other way around. For example:

"*Q.* Did Mr. Salazar ask you for an address or a phone number where he could get in touch with you, Mr. Martinez?

"*A.* No, sir.

"*Q.* But you voluntarily gave him one, didn't you?

"*A.* [Y]es, sir. After he told me that he would look for me after he got out.

---

[3] *People v Chapman, supra,* fn 1, p 586.

"*Q.* Now, Mr. Martinez, Mr. Salazar never offered to have you do this job for him, did he?

"*A.* You mean he never asked me?

"*Q.* He never asked you?

"*A.* No, sir. He agreed with me.

"*Q.* Excuse me?

"*A.* He agreed with me.

"*Q.* Did he ever ask you to do a contract involving the murder of Ron Neil and Larry Kimmel?

"*A.* No, sir. But I asked him, and he said, yes.

"*Q.* I know you asked him. Every time that came up, you asked him; right?

"*A.* Yes, sir.

"*Q.* And you could never get him to say, okay. Mr. Martinez, I'll have you do this, could you?

"*A.* He didn't say I'll have you do this, but he did say, yes.

"*Q.* He kept putting you off, didn't he?

"*A.* Yes, sir. He didn't want to talk inside the jail.

"*Q.* He kept putting you off?

"*A.* Yes, sir.

"*Q.* He never agreed with you to do anything regarding the murder of Ron Neil and Larry Kimmel, did he?

"*A.* He did say, yes, at one point.

"*Q.* He said, yes, what?

"*A.* That he wanted, not Ron Neil, by that time he had told me Ron Neil had already been taken care of, he had been put away and he was never coming back to court no more, he would never show up here no more. And then I asked him if he still wanted me to take care of Larry for him. And I think I said, the policeman's friend, did he still want me to take care of that for him, and he said, yes, or something to that effect."[4]

As noted above, incitement requires an urging, a persuading, or the like. But the record, when read as a whole, does not reflect that the defendant

---

[4] Detective Neil was never "put away" but was alive and well and testified at trial.

urged or persuaded Martinez to participate in any capacity in the killing of Neil or Kimmel. Arguably, the testimony may have supported a conviction for conspiracy to kill Neil and Kimmel, but does not support a conviction for incitement to aid and abet murder under § 157b. MCL 750.157b; MSA 28.354(2).

Our decision in this respect makes it unnecessary to discuss Issues II (entrapment), IV (withdrawal), V (remand for further findings), or VI (cruel and unusual punishment) raised by defendant.

Reversed and conviction ordered vacated.